997 So.2d 218 (2008)
Thomas C. GRIFFITH, Appellant/Cross-Appellee
v.
Harry GRIFFITH, Appellee/Cross-Appellant.
No. 2006-CA-01849-COA.
Court of Appeals of Mississippi.
December 2, 2008.
*220 Renee M. Porter, attorney for appellant.
T. Jackson Lyons, Jackson, attorney for appellee.
Before KING, C.J., IRVING and CHANDLER, JJ.
KING, C.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. The Ray Griffith Company, Inc. (RGC), began in the 1950s in Columbia, Mississippi when Ray Griffith purchased the rights to a patent to manufacture a pecan picker. In 1992, RGC was devised to Ray's two sons, Tom and Harry Griffith. Tom was given direct ownership of three shares of the company, and Harry was given direct ownership of two shares of the company. Additionally, a trust was set up in each sons' name with each trust holding eighty-seven and one-half shares.
¶ 2. Tom operated RGC from 1983 to 1990. In 1990, the board of directors appointed Harry as president of RGC and authorized Harry to receive $1,000 per month in compensation. In addition, the board decided that all company checks must be signed by two people  Harry and Steve Gray, a certified public accountant and the treasurer of RGC. In 1992, Tom was appointed the vice-president of RGC and served in this capacity until 2002.
¶ 3. During his time as president of RGC, Harry also owned and operated two other businesses  Woodstock Toys and Custom Powder Coat. Custom Powder Coat was actually used to coat the pecan pickers manufactured by RGC. In addition to its work for RGC, Harry also planned to contract work for Custom Powder Coat with other companies. Tom approved this project.
¶ 4. Business was going well for RGC. However, in September 2000, a customer cancelled a shipment of pecan pickers because he had found a cheaper supplier. Harry investigated the matter and discovered that a competitor was selling "knock-off" pecan pickers, which were manufactured in China, for two dollars less than RGC's price. Harry asked Tom if RGC could also purchase the cheaper pecan pickers, but Tom declined.
¶ 5. Every year, Tom and Harry would split RGC's dividends. However, in the *221 late 1990s, Tom noticed that RGC's dividends were decreasing. Tom asked Harry about the decline, and Harry explained that RGC's overhead costs had increased, which contributed to the decrease in dividends. Tom accepted Harry's representations as true and did not inquire further into the matter.
¶ 6. In January 2001, Tom asked Harry how much money would be available for dividends that year. Harry informed Tom that there would not be any dividends that year because of the increased overhead costs. This time, Tom decided to check the company's books. Tom discovered that Harry had been using RGC's account for his personal expenses and expenses related to Harry's other two businesses. Tom also discovered that the checks written on RGC's account had not been signed by Gray as mandated by the board.
¶ 7. On June 17, 2002, Tom filed suit against Harry, alleging conversion and breach of fiduciary duty. Tom also requested an accounting regarding RGC's funds and a temporary restraining order against Harry. Upon the chancellor's order, an emergency shareholders' meeting was held at which Harry was removed as president of RGC, and Tom was appointed as temporary receiver and authorized to take control of the management of the company. The chancellor also granted the temporary restraining order, which prohibited Harry from using RGC's records and property. After Harry was removed as president of RGC, he began his own company named Pecans, Etc., which sold the cheaper pecan pickers that were manufactured in China. Tom later amended his complaint to add the claim that Harry usurped a corporate opportunity.
¶ 8. During the trial, Harry admitted that he had charged some of his personal expenses to RGC's account. However, Harry maintained that out of those personal expenses, his cell phone bill, car repairs, gas, and health insurance were necessary business expenses. Tom disputed this assertion. Harry also admitted that he used some of RGC's funds for expenses related to his other two businesses. However, Harry maintained that RGC was reimbursed for these funds.
¶ 9. The chancellor appointed a certified public accountant (CPA) to investigate RGC's financial records. The CPA testified that he could not make a proper interpretation of RGC's financial records because of RGC's poor bookkeeping. However, the CPA found that Harry had charged $54,490 in personal expenses to RGC's account. Using RGC's past tax returns, the CPA estimated that over the years, Tom's share of profits should have been approximately $138,000.
¶ 10. The chancellor found that Harry misappropriated corporate funds and breached his fiduciary duty to Tom. The chancellor awarded Tom $27,245, which represented one-half of the amount Harry charged to RGC's account in personal expenses. The chancellor stated that the poor bookkeeping made it impossible for the court to determine what funds were actually used for legitimate business purposes and what funds Harry had actually reimbursed to RGC.
¶ 11. Aggrieved, Tom filed a motion to alter or amend the judgment, requesting the chancellor to do the following: (1) award him damages for Harry's misappropriation of a corporate opportunity, (2) order Harry to pay for the funds unaccounted for and missing from the corporate account, (3) prohibit Harry from further competing with RGC, and (4) award him attorney's fees. The chancellor declined to award Tom additional compensatory damages, finding that there was not any clear and convincing evidence showing what the missing funds were actually used for and *222 what funds Harry had actually reimbursed. However, the chancellor found that Harry's operation of RGC was so wanton and aggravated as to warrant an award of punitive damages in the amount of $50,000 and an award of attorney's fees in the amount of $5,000.
¶ 12. Now, both Tom and Harry appeal from the chancellor's judgment. Tom argues that the chancellor erred by not awarding him damages that would fully compensate him for Harry's misappropriation of RGC's funds. Tom also requests interest, attorney's fees, and damages based upon Harry's misappropriation of a corporate opportunity. Harry argues that the chancellor's ruling that he usurped a corporate opportunity should be reversed because Tom failed to seek leave of court to amend his complaint to include this claim, and Tom rejected the corporate opportunity, which is a complete defense to the claim.

ANALYSIS
¶ 13. This Court reviews a chancellor's findings of fact under an abuse of discretion standard of review. See Speetjens v. Malaco, Inc., 929 So.2d 303, 308(¶ 4) (Miss. 2006) (citing Longanecker v. Diamondhead Country Club, 760 So.2d 764, 767(¶ 7) (Miss.2000)). Therefore, this Court will not disturb a chancellor's findings when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard. Id.

I. Whether the chancellor erred in his award of damages to Tom.
¶ 14. Tom complains that the chancellor failed to fully compensate him for Harry's wrongdoings. Tom maintains that the chancellor should have also awarded him the following: (1) $156,725.50, which is one-half of the amount of RGC's funds that are unaccounted for, and $16,181.83, which is the difference between Harry's draws and Tom's draws on RGC's account, plus interest, (2) damages for lost profits due to Harry's competing business, (3) attorney's fees, and (4) a restraining order against Harry to cease competition with RGC. Conversely, Harry asserts that the chancellor properly awarded Tom damages for misappropriated funds. Harry also argues that the chancellor erred by awarding Tom punitive damages.

a. Damages for Misappropriation of Funds
¶ 15. RGC is not a party to this action. Essentially, Tom filed a shareholder's derivative action against Harry. Tom alleged that Harry breached a fiduciary duty to him. This duty is owed to the corporation, RGC, first and foremost, and it is only owed to Tom derivatively. See ERA Franchise Sys. v. Mathis, 931 So.2d 1278, 1281(¶ 9) (Miss.2006) (citing Derouen v. Murray, 604 So.2d 1086, 1091 (Miss. 1992)). However, in the case of a closely-held corporation, a chancellor may treat a shareholder's derivative suit as a direct action and order an individual recovery as long as it will not prejudice the interests of the creditors, expose the corporation to multiple actions, and prejudice recovery for all other interested parties. Id. (citing Derouen, 604 So.2d at 1091, n. 2).
¶ 16. Tom argues that the chancellor should have awarded him damages for RGC's unaccounted for funds and for the difference between his draws and Harry's draws from the corporate account. Harry argues that the personal expenses he charged to the account were legitimate business expenses; therefore, Tom should not have been awarded any damages for these expenses.
¶ 17. Based on our review of the record, we find that the chancellor did not err in *223 his award. Although Harry claims that his cell phone bill, gas, health insurance, and car repairs were legitimate business expenses, Tom maintained that he neither knew of these charges nor did he agree to these expenses. As the sole trier of fact, the chancellor determines the credibility of the witnesses and what weight to give to the evidence. See Heidkamper v. Odom, 880 So.2d 362, 365(¶ 10) (Miss.Ct.App.2004) (citing Carter v. Carter, 735 So.2d 1109, 1114 (¶¶ 18-20) (Miss.Ct.App.1999)). Obviously, the chancellor believed Tom's testimony. Based on our review of the record, we find no reason to question the chancellor's judgment; accordingly, we find that the chancellor did not err in his decision.
¶ 18. We also find that the chancellor did not err in the amount he awarded Tom. The chancellor found that Harry had misappropriated corporate funds and breached his fiduciary duty to Tom. Although more than $313,000 was at issue, the chancellor determined that it was only clear from the evidence that Harry received a personal benefit of $54,490. Therefore, the chancellor only awarded Tom $27,245, representing his one-half interest of Harry's personal expenses, because Tom failed to show that the remaining funds in controversy had actually been diverted. Since the evidence was unclear whether Harry diverted the remaining funds in controversy, we find that the chancellor's award to Tom, representing Tom's one-half interest of the personal expenses that Harry charged to RGC's account, was proper. This assignment of error is without merit.

b. Lost Profits
¶ 19. Tom also argues that he was entitled to an award for the lost profits that RGC sustained because of Harry's competing pecan-picker business. However, we find that Tom does not have standing to sue Harry based on this ground. The supreme court has held that:
[A] corporation is an entity separate and distinct from its stockholders.... [W]here the basis of a suit is a wrong to the corporation, a plaintiff may not bring suit in his individual capacity to redress the wrong. The cause of action belongs solely to the corporate entity and may be asserted only by the corporation itself or by the plaintiff in a representative capacity in the form of a shareholders derivative suit. We then stated that: "The corporation is an indispensable party to such an action." We made it clear that the rule applies even though the individual stockholder owns all or substantially all of the stock in the corporation.
Fairchild v. Keyes, 448 So.2d 292, 294 (Miss.1984) (internal citation omitted). Therefore, it follows that only RGC can recover damages for lost profits it sustained due to Harry's competing business. In his individual capacity, Tom is not entitled to receive damages for lost profits on RGC's behalf. Since RGC was not joined as a party in this lawsuit, we find that the chancellor did not err by denying Tom's request for damages for lost profits. This assignment of error has no merit.

c. Punitive Damages
¶ 20. Harry argues that the chancellor erred by awarding Tom $50,000 in punitive damages because Tom failed to prove that his conduct was malicious and because the chancellor did not have an evidentiary hearing on the matter. Mississippi Code Annotated section 11-1-65(1)(a) (Supp.2008) provides that punitive damages may be awarded where the plaintiff proves by clear and convincing evidence that the defendant (1) acted with actual malice, (2) acted with gross negligence which evidences a willful, wanton, or *224 reckless disregard for the safety of others, or (3) committed actual fraud. As the finder of fact, it is within the chancellor's sound discretion whether to grant an award of punitive damages. See Aqua-Culture Techs., Ltd. v. Holly, 677 So.2d 171, 184 (Miss.1996). "[T]he question of whether punitive damages should be awarded depends largely upon the particular circumstances of the case." Id.
¶ 21. The chancellor awarded Tom punitive damages based on Harry's operation of RGC, stating that it was clearly so wanton and aggravated as to warrant an award of punitive damages. Harry admitted that he used RGC's funds for his personal expenses and for the expenses of his other two businesses. Additionally, the court-appointed CPA and the chancellor found that RGC's financial records were not properly maintained and were in poor condition. Based on the foregoing, we hold that the chancellor's finding that Harry operated RGC with gross negligence, evidencing a willful, wanton, or reckless disregard for the financial security of the company, which warrants an award of punitive damages, is supported by the evidence. Therefore, we find that the chancellor did not err by awarding Tom punitive damages based on Harry's operation of RGC.

d. Attorney's Fees
¶ 22. The chancellor awarded Tom $5,000 in attorney's fees. Tom argues that the chancellor's award of attorney's fees was insufficient.
¶ 23. In its discretion, the trial court may award attorney's fees, absent a contractual provision or statutory authority, where the trial court has found that punitive damages are appropriate. See Aqua-Culture Techs., 677 So.2d at 184 (citing Greenlee v. Mitchell, 607 So.2d 97, 108 (Miss.1992)). "The determination of an amount constituting a reasonable attorney's fee is within the sound discretion of the trial court." Patterson v. Holleman, 917 So.2d 125, 135(¶ 32) (Miss.Ct.App.2005) (citation omitted). This Court will not disturb the trial court's award of attorney's fees unless there was an abuse of discretion. Id.
¶ 24. The chancellor found that Harry's operation of RGC warranted an award of punitive damages. In his discretion, the chancellor also awarded Tom $5,000 toward his attorney's fees. In his brief, Tom simply asserts that the trial court should have awarded him attorney's fees in full because Harry was responsible for the lawsuit. However, this is not the standard. Tom had the burden of proving that the chancellor abused his discretion, and he failed to do so. Since Tom failed to show that the chancellor abused his discretion, and we cannot find any evidence that the chancellor's award of attorney's fees was improper, we find that the chancellor did not abuse his discretion by awarding Tom $5,000 toward his attorney's fees. Tom's argument is wholly without merit.

e. Restraining Order
¶ 25. Tom argues that the chancellor erred by not granting him a restraining order directing Harry to cease competition with RGC. The grant or denial of a restraining order or injunction is within the sound discretion of the chancellor. See Ruff v. Estate of Ruff, 989 So.2d 366, 369(¶ 11) (Miss.2008). This Court will not disturb the trial court's ruling absent a finding that the chancellor abused his discretion. Id.
¶ 26. On appeal, Tom was required to prove to this Court that the trial court abused its discretion by not granting him a restraining order against Harry. However, Tom failed to specifically address *225 this issue in his brief. A party's failure to cite authority in support of an argument precludes consideration of the issue on appeal. Boutwell v. Boutwell, 829 So.2d 1216, 1223(¶ 29) (Miss.2002). Since Tom failed to address this issue in his brief, we decline to address the merits of this assignment of error.

II. Whether the chancellor erred by finding that Harry usurped a corporate opportunity.
¶ 27. Harry argues that the chancellor erred by finding that he usurped a corporate opportunity for two reasons. First, Harry contends that the chancellor improperly allowed Tom to amend his complaint to include this issue because Tom did not seek leave of court to amend. Second, Harry argues the chancellor erred by awarding Tom damages based on his alleged usurpation of a corporate opportunity because Tom rejected the opportunity, which is a complete defense to the claim.
¶ 28. Mississippi Rule of Civil Procedure 15(a) provides that a party may freely amend a pleading before a responsive pleading is served. "Otherwise a party may amend a pleading only by leave of court or upon written consent of the adverse party; leave shall be freely given when justice so requires." Id.
¶ 29. Tom filed his complaint on June 17, 2002. Harry answered the complaint on September 16, 2002. Tom filed his amended complaint on March 5, 2003. Then, Harry made a motion to strike the amended complaint because Tom failed to seek leave of court to amend. The trial court did not rule on the motion.
¶ 30. After reviewing the record, we do not find any evidence that Tom sought leave of court to amend his complaint. Tom was obligated to seek a ruling on his motion to amend. See Anderson v. McRae's, Inc., 931 So.2d 674, 678(¶ 10) (Miss.Ct.App.2006). "It `is the responsibility of the movant to obtain a ruling from the court on motions filed by him, and failure to do so constitutes a waiver of [the] same.'" Id. (quoting Billiot v. State, 454 So.2d 445, 456 (Miss.1984)). However, we find that if this is error, it is only harmless error because Harry did not suffer any prejudice based on the chancellor's failure to rule.
¶ 31. The chancellor heard evidence regarding Harry's alleged usurpation of a corporate opportunity. However, the record is clear that the chancellor did not award Tom any damages based on this claim. The chancellor awarded Tom $27,245 for misappropriation of corporate funds, $50,000 in punitive damages for Harry's grossly negligent operation of RGC, and $5,000 in attorney's fees. In his decision, the chancellor stated the following:
[I]n reviewing the pleadings and the proof adduced at trial and the post[-]trial pleadings, the Court now finds the actions of Defendant, as fiduciary and one in charge of the operation of the business, are so wanton and aggravated as to warrant punitive damages to compensate Plaintiff above the damages awarded which barely compensate him for the losses incurred based on the difficulty in ascertaining where the unaccounted funds were spent.
This statement clearly shows that the chancellor's award was based on Harry's poor bookkeeping and poor management of RGC, not his alleged usurpation of a corporate opportunity. Because the chancellor did not base his award of damages on Harry's alleged usurpation of a corporate opportunity, we find that this issue is without merit. Thus, we will not address the merits of this argument.

*226 CONCLUSION
¶ 32. We find that the chancellor's award of damages to Tom was supported by substantial evidence and was neither arbitrary nor capricious. Therefore, the chancellor did not err in Tom's award of damages. Because the chancellor did not award any damages based on Harry's alleged usurpation of a corporate opportunity, the cross-appeal is without merit. For the foregoing reasons, we affirm the chancellor's decision.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF MARION COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND THE APPELLEE/CROSS-APPELLANT.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. GRIFFIS, J., CONCURS IN THE RESULT. CARLTON, J., NOT PARTICIPATING.